# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| J.M.M. et al., | 2:14-cv-01197-JAD-NJK |
| Plaintiffs | **Order Denying Defendant Lisa Brochu's Motion for Summary Judgment** |
| v. | **[ECF 46]** |
| Andrea Hernandez, et al., | |
| Defendants | |

Minor plaintiffs J.M.M. and I.M. sue Clark County, a handful of Clark County Department of Family Services (DFS) employees, and their former foster parents Andrea and Waldo Hernandez for injuries the boys allegedly sustained while in the Hernandezes' care.[1] Plaintiffs allege that the DFS defendants were (1) deliberately indifferent to their safety in violation of 42 USC 1983 and (2) negligent under Nevada law for failing to adequately supervise their care.

Former DFS caseworker Lisa Brochu moves for summary judgment on both of plaintiffs' claims against her.[2] She argues that she enjoys qualified immunity from the § 1983 claim[3] and discretionary immunity from the state-law negligence claim.[4] Brochu also argues that she is entitled to summary judgment on the § 1983 claim because plaintiffs lack evidence that she was deliberately indifferent to their safety.[5] I find that neither qualified nor discretionary immunity shields Brochu from liability, and because plaintiffs have offered evidence from which a reasonable jury could find Brochu was deliberately indifferent, I deny her motion for summary judgment.

---

[1] ECF 1-2.

[2] ECF 46.

[3] *Id.* at 6–10.

[4] *Id.* at 10–13.

[5] *Id.* at 13.

**Background**

In September 2010, a foster child in the Hernandezes' care was removed from their home after the boy's natural parents complained about a suspicious bruise on his body.[6] A DFS report indicates that these allegations were "unsubstantiated,"[7] but the boy was removed and placed in another home shortly after the complaint was made.[8]

J.M.M. was born in April 2012 and immediately taken into protective custody.[9] He was placed with the Hernandezes when he was only ten days old.

In December 2012, three other foster children in the Hernandezes' care were taken to Child Haven for a body check after a school counselor complained about their hygiene and frequent absences from school.[10] The body checks revealed red marks, bruises, scratches, and rashes. A DFS report detailing the inspection concludes that "the bruises are suspicious for abuse, and there are just too many."[11] The three children were swiftly removed from the Hernandezes' care; J.M.M. remained.

Six months later, in the first or second week of June 2013, J.M.M. sustained burns to his right buttocks and arm when the Hernandezes' biological son placed him on a black metal refrigerator that was hot from sitting outside in the sun.[12] The Hernandezes reportedly treated the burns at home with hydrogen peroxide and over-the-counter ointments; they did not seek professional medical care.

Brochu was the caseworker assigned to J.M.M. and later I.M. According to Brochu's case notes, she visited the Hernandez home in June, July, and August 2013. Brochu's notes indicate that

---

[6] ECF 55-1 at 2.

[7] *Id.*

[8] *Id.*

[9] ECF 55 at 2.

[10] ECF 55-1 at 4.

[11] *Id.*

[12] *Id.* at 10:10–17.

during a June 13, 2013, visit, J.M.M. wore only a diaper and that she watched Andrea Hernandez change him.[13] Brochu wrote that J.M.M. appeared healthy and had no diaper rash, marks, or bruises. Her notes also indicate that the Hernandezes were reportedly "getting closer to moving to Sandy Valley" from their home in Las Vegas and that "[t]heir trailer [would be] delivered shortly."[14]

Brochu visited the Hernandez home again on July 8, 2013.[15] Her notes from that visit indicate that J.M.M. wore a diaper and a tee shirt,[16] that she again observed a diaper change, and that J.M.M. had no marks or bruises. Brochu wrote that Andrea Hernandez reported that all medical appointments had been met, that there were no appointments pending,[17] and that the Hernandezes were still in the process of moving to Sandy Valley.[18]

Brochu made another contact visit exactly one month later.[19] Her notes state that J.M.M. wore only a diaper during this visit and that he "looked well, had good color and had no unusual marks or bruises." Andrea again reported to Brochu that J.M.M. was up to date on all medical visits and immunizations.[20] Brochu noted that the house appeared very "picked up"; many things had already been taken to the new Sandy Valley residence.[21] Though Brochu indicated in her report that Andrea gave her the Sandy Valley address, the new address is not included.

J.M.M.'s biological brother I.M. was born on July 26, 2013. He was taken into custody on

---

[13] *Id.* at 29.

[14] *Id.*

[15] *Id.* at 31.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 33.

[20] *Id.*

[21] *Id.*

August 27, 2013,[22] and immediately placed with J.M.M. with the Hernandezes.

DFS attempted to visit the Hernandez home in Las Vegas approximately three weeks later to conduct a licensing-renewal inspection, but no one was home. After learning that the Hernandezes were reportedly residing in Sandy Valley four days per week, licensing visited Sandy Valley to inspect the new home.[23] Because the new address was not listed in Brochu's report, DFS obtained the address by contacting the Sandy Valley school that the Hernandezes' biological children attended. When licensing found the Hernandezes' new "home" in Sandy Valley, they discovered that it was a motor home that did not meet DFS licensing requirements, and DFS removed J.M.M. and I.M. from the trailer.[24]

J.M.M. and I.M. were then taken to Child Haven for physical examination. I.M. "was observed to have yeast under his neck, under both arm pits and severe diaper rash to include blistering and peeling skin."[25] J.M.M. also "had an oval shaped healed burn mark that covered a 2 1/2 inch by 3 inch area of his right buttock from his waist area to his hip and down the back of his thigh" and a partially-healed burn mark on his right arm that "started on the underside of his wrist and went down to his elbow" measuring 1 3/4 inches wide.[26] Both children were behind on vaccinations[27] and appeared filthy.[28]

Shortly thereafter, Child Protective Services, in conjunction with Las Vegas Metropolitan Police Department, investigated the Hernandezes for child abuse and neglect. The Hernandezes reported at that time, and continue to maintain, that J.M.M.'s burns happened accidentally during the

---

[22] ECF 55 at 2.

[23] ECF 55-1 at 44.

[24] *Id.* at 44.

[25] *Id.* at 27.

[26] *Id.*

[27] *Id.* at 25.

[28] *Id.* at 27.

first or second week of June 2013 when their eleven-year-old biological son placed J.M.M. on a hot metal surface to change his diaper.[29] They admittedly sought no medical treatment for J.M.M.'s burns because they feared that he would be taken away or that their son would be in trouble. The Hernandezes' son substantially confirmed this version of events.[30] There is contradictory testimony about whether the Hernandezes actively concealed J.M.M.'s injuries during Brochu's June, July, and August home visits.[31] DFS terminated Brochu in October 2013 for her failure to follow the agency's Out of Home Permanency policies and procedures.[32]

      J.M.M. and I.M., through their natural mother Jessica Hargrove, sue defendants for burns, skin rashes, and medical neglect that occurred between June and September 2013 while the boys were in the Hernandezes' foster care and, in turn, under the supervision of DFS workers, including Brochu. Plaintiffs allege that Brochu "was the case manager who was assigned to oversee the placement and care of" plaintiffs[33] and that she allowed the Hernandezes "to continue acting as foster parents for [plaintiffs] after and despite learning" that J.M.M. sustained second-and-third degree burns in June 2013.[34] Plaintiffs further allege that Brochu "did not visit the children or the [Hernandezes' home] as required by applicable policies"[35] or perform required body checks.[36] Finally, they allege that, had Brochu "followed Clark County's stated procedures, she could have discovered evidence of abuse and violations and removed [plaintiffs] from this foster home before

---

[29] *Id.* at 54, 10:10–17.

[30] *Id.* at 19.

[31] *Compare id.* at 13:5–9 (Andrea Hernandez's deposition testimony) *with id.* at 54 (DFS report) and *id.* at 29–33 (Brochu's visitation notes).

[32] ECF 55-1 at 28–29.

[33] ECF 1-2 at 4.

[34] *Id.* at 9–10.

[35] *Id.* at 10.

[36] *Id.* at 13.

they could be subjected to continued abuse and neglect."[37]

Brochu moves for summary judgment. She argues that qualified and discretionary-function immunity shield her from liability for either of plaintiffs' claims and that plaintiffs have failed to offer any facts to support a finding of deliberate indifference, as required for their §1983 claim.

## Discussion

### A.   Summary-Judgment Standards

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[38] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[39] If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[40]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[41] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; he "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[42] The court only

---

[37] *Id.* at 10.

[38] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

[39] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[40] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[41] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[42] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at 248–49.

considers properly authenticated, admissible evidence in deciding a motion for summary judgment.[43]

**B.    42 USC 1983**

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."[44]  To state a claim under § 1983, a plaintiff must allege that (1) a person acting under color of state law (2) violated a right secured to plaintiff by the Constitution or the laws of the United States.[45]

Plaintiffs invoke the Fourteenth Amendment due-process clause, which "protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent."[46]  To violate due process, state officials must act with deliberate indifference to the child's well being.[47]  Deliberate indifference has both subjective and objective components.  First, a plaintiff must show that an objectively substantial risk of harm existed.  Second, a plaintiff must show that the officials "were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either [1] the official actually drew that inference or [2] that a reasonable official would have been compelled to draw that inference."[48]

**C.    Qualified Immunity under Section 1983**

Qualified immunity shields state actors from monetary liability under § 1983 unless (1) the facts alleged by the plaintiff establish a violation of the plaintiff's constitutional rights and (2) the constitutional right in question was "clearly established" when the alleged misconduct occurred.[49]  A state official enjoys qualified immunity if she "reasonably believes that [her] conduct complies with

---

[43] FED. R. CIV. P. 56(c); *Orr*, 285 F.3d at 773–74.

[44] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal citations and quotations omitted).

[45] *West v. Atkins*, 487 U.S. 42, 48–49 (1988).

[46] *Tamas v. Dep't. of Soc. & Health Serv.*, 630 F.3d 833, 842 (9th Cir. 2010).

[47] *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).

[48] *Tamas*, 630 F.3d at 845 (internal citations omitted).

[49] *Pearson v. Callahan*, 555 U.S. 223 (2009).

the law."[50]  A constitutional right is "clearly established" if the contours of the right are "sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right."[51]

**D.    Brochu is not entitled to qualified immunity from plaintiffs' § 1983 claim**.

At the time Brochu acted—or failed to act—the law in this circuit clearly established that foster children have a liberty interest in social worker supervision and protection from harm inflicted by a foster parent.[52]  And the Ninth Circuit has also recognized that "[o]nce a state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care and treatment . . . ."[53]  A social worker who fails to discover or report allegedly obvious signs of abuse and neglect violates the child's due-process rights, and these principles were clearly recognized by 2013.  Brochu is therefore not entitled to qualified immunity for plaintiffs' § 1983 claim.

**E.    Brochu is not entitled to summary judgment on plaintiffs' § 1983 claim because whether she was deliberately indifferent to their safety is genuinely disputed.**

Brochu argues that "nothing in the record suggests an objectively substantial risk of harm to [p]laintiffs existed."  I disagree.  Plaintiffs have offered evidence from which a reasonable jury could conclude otherwise:  Andrea Hernandez testified that J.M.M. sustained the burns on his buttocks and right arm in the first or second week of June 2013.[54]  Though it is unclear whether J.M.M. suffered these burns before Brochu's June 13, 2013, visit, the record suggests that the burns were present by her July and August 2013 visits.  Severe burns support a finding of an objectively substantial risk of harm.

Plaintiffs have also offered evidence from which a reasonable jury could conclude that the

---

[50] *Id.* at 244.

[51] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[52] *Tamas*, 630 F.3d at 842.

[53] *Lipscomb By & Through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992) (internal citations omitted).

[54] ECF 55-1 at 54, 10:10–17.

subjective component is satisfied. Brochu testified at her deposition that she never observed any marks on J.M.M. and that she believed the Hernandez home to be a safe environment.[55] And, according to her own notes, she observed no marks on J.M.M.'s body during the July 2013 visit even though she watched Andrea change him.[56] Nor did she observe any marks on his body during the August 2013 visit even though J.M.M.'s arms were exposed.[57] But the record suggests that the burn marks both on J.M.M.'s arm (measuring approximately 1 3/4 inches wide and running from the underside of his right wrist to his elbow[58]) and on his buttocks (a 2 1/2 by 3 inch oval mark from his waist down the back of his thigh[59]) would have been visible when Brochu visited and reportedly saw him naked in July and August. A reasonable jury could conclude from these facts either that Brochu knew that a subjective risk of harm existed because she saw the marks or that a reasonable case worker would have been compelled to draw that inference. "[T]he subjective component may be inferred from the fact that the risk of harm is obvious."[60] Accordingly, there are genuine issues of material fact, and Brochu is not entitled to summary judgment on plaintiffs' § 1983 claim.

**F.  Discretionary-Function Immunity**

The Nevada Supreme Court has adopted the Supreme Court's *Berkovitz-Gaubert*[61] test to determine whether a state official's actions are protected by discretionary immunity.[62] To qualify, a state official's action must (1) involve an element of individual judgment or choice and (2) be based

---

[55] ECF 46 at 9–10.

[56] ECF 55-1 at 31.

[57] *See id.* at 33 (stating that J.M.M. wore only a diaper and that Andrea Hernandez performed a diaper change in front of Brochu).

[58] ECF 55-1 at 27.

[59] *Id.*

[60] *Tamas*, 630 F.3d at 845 (internal citations omitted).

[61] *See Berkovitz v. United States*, 486 U.S. 531 (1988); *United States v. Gaubert*, 499 U.S. 315 (1991).

[62] *Martinez v. Maruszczak*, 168 P.3d 720, 728–29 (Nev. 2007); NEV. REV. STAT. 41.032(2).

on considerations of social, economic, or political policy.[63] "[I]f the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped, immunity will likely attach under the second criterion."[64] Courts need not determine that a state actor "made a conscious decision regarding policy considerations";[65] the inquiry instead focuses "on the nature of the actions taken and on whether they are susceptible to policy analysis."[66]

**G.     Brochu is not entitled to discretionary immunity on plaintiffs' negligence claim.**

Though discretionary-function immunity shields social workers from liability for discretionary and governmental decisions, like recommending that a child be placed in or removed from foster care, it does not shield Brochu's day-to-day supervision of J.M.M. and I.M.'s care while wards of the state. A social worker's day-to-day supervisory decisions involve a certain degree of personal judgment and choice and thus satisfy the first prong of the *Berkovitz-Gaubert* test, but those decisions are generally not based on governmental policy considerations, as required to satisfy the second prong. Brochu's alleged decisions not to conduct required body checks, report allegedly obvious signs of abuse, or require the Hernandezes to provide required medical documents were not based on considerations of social, economic, or political policy; nor are these decisions readily susceptible to policy analysis. Because it does not appear that Brochu engaged in policy-making decisions in her supervision of J.M.M. and I.M.'s foster care by the Hernandezes, she is not entitled to immunity from suit under Nevada law.

Brochu argues that under the Nevada Supreme Court's decision in *Foster v. Washoe County*, she is absolutely immune from suit for her work as plaintiffs' caseworker.[67] The *Foster* Court held

---

[63] *Id.* at 729.

[64] *Id.* (internal citations and quotations omitted).

[65] *Id.* at 728.

[66] *Id.*

[67] ECF 46 at 12.

that "social workers must be absolutely immune from suits alleging the improper investigation of child abuse, removal of a minor from the parental home based upon suspicion of abuse, and the instigation of dependency proceedings."[68] But the *Foster* case is not controlling because it predates the Nevada Supreme Court's adoption of the *Berkovitz-Gaubert* test.[69] The *Foster* court considered only whether the defendant caseworker's alleged failure to adequately investigate allegations of child abuse involved "'personal deliberation, decision and judgment;'"[70] it did not consider whether the alleged failure was also "susceptible to policy analysis."[71]

The *Foster* case is also factually distinguishable because the minor plaintiffs in that case were not wards of the state. In *Foster*, the state district court appointed a caseworker to investigate possible sexual abuse after the plaintiffs' father filed a police report and a report with social services alleging that the plaintiffs' mother and her then-husband were abusing the boys.[72] After the criminal investigation against them was closed, the mother filed suit on behalf of the boys alleging that the court-appointed caseworker failed to "adequately investigate the 'wrongful allegations of sexual misconduct.'"[73] Here, J.M.M. and I.M. allege not only failure to adequately investigate allegations

---

[68] *Foster v. Washoe Cnty*, 964 P.2d 788, 792 (Nev. 1998). The *Foster* court held that the caseworker was entitled to both discretionary immunity and quasi-judicial immunity. But the Nevada Supreme Court has since ruled that "Quasi-judicial immunity does not apply to state agencies or their employees for the day-to-day management and care of their wards." *State v. Second Jud. Dist. Court ex rel Cnty of Washoe*, 55 P.3d 420, 426 (Nev. 2002). In short, state employees engaged in child protective services are entitled to quasi-judicial immunity when they provide information to the court, like making a recommendation that a child be taken in to custody; they are not entitled to quasi-judicial immunity for actions taken (or not taken) after a court makes a child a ward of the state. *Id.* at 427. Brochu does not raise a quasi-judicial immunity defense, and I find that it does not apply to the facts in this case.

[69] The Nevada Supreme Court adopted the *Berkovitz-Gaubert* test in *Martinez* in 2007; *Foster* was decided almost a decade earlier, in 1998.

[70] *Foster*, 964 P.2d at 792 (internal citations omitted).

[71] *Martinez*, 168 P.3d at 728 (quoting *Gaubert*, 499 U.S. at 325).

[72] *Foster*, 964 P.2d at 790.

[73] *Id.* at 791.

of abuse but also failure to adequately supervise their day-to-day care at the Hernandezes' by conducting required body checks, reporting obvious signs of abuse, and obtaining required medical documents. Because Brochu's decisions to perform (or not perform) these functions did not require consideration of social, economic, or political policy as required under the *Berkovitz-Gaubert* test, discretionary immunity does not shield her from liability for those acts or omissions.

## Conclusion

Accordingly, it is HEREBY ORDERED, ADJUDGED, and DECREED, that Defendant Brochu's Motion for Summary Judgment **[ECF 46]** is **DENIED.**

This case is referred to the magistrate judge for a settlement conference. The parties' obligation to file their joint pretrial order is stayed until 15 days following the settlement conference.

Dated December 7, 2015

_____
Jennifer A. Dorsey
United States District Judge